No. 11-17676

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

BORIS Y. LEVITT, et al.,

*Plaintiffs-Appellants*,

v.

YELP! INC.,

*Defendant-Appellee*.

_____

On Appeal From The United States District Court
For The Northern District Of California

3:10-CV-01321-EMC & 3:10-CV-02351-EMC (Consolidated)
_____

## APPELLEE'S ANSWERING BRIEF
_____

S. ASHLIE BERINGER
*Counsel of Record*
MOLLY CUTLER
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, California 94304
(650) 849-5300

AARON SCHUR
YELP INC.
706 Mission Street
San Francisco, California 94304
(415) 908-3801

*Attorneys for Defendant-Appellee*
*Yelp Inc.*

# CORPORATE DISCLOSURE STATEMENT

Yelp has no parent corporation. According to Yelp's Prospectus filed with the United States Securities and Exchange Commission on March 2, 2012, the following beneficial owners hold more than 10% of Yelp's outstanding common stock:

      Bessemer Venture Partners and related entities

      Elevation Partners and related entities

      Benchmark Capital Partners V, L.P.

      Max Levchin

      Jeremy Stoppelman

      Fred Anderson

      Peter Fenton

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ..............................................3

I.    YELP'S CONSUMER REVIEW PLATFORM ..............................3

II.    PLAINTIFFS' ALLEGATIONS ..................................................6

    A.    Non-Sponsor Plaintiffs ........................................................7

    B.    Sponsor Plaintiff Tracy Chan ............................................14

III.    PROCEDURAL HISTORY ......................................................16

    A.    Order Dismissing Second Amended Complaint ..................17

    B.    Order Dismissing Third Amended Complaint With Prejudice ............................................................................19

STANDARD OF REVIEW ....................................................................22

SUMMARY OF ARGUMENT ..............................................................23

ARGUMENT ........................................................................................25

I.    YELP'S PUBLISHING ACTIVITIES ARE SHIELDED FROM LIABILITY UNDER COMMUNICATIONS DECENCY ACT SECTION 230. ..........................................................................25

    A.    Congress Created CDA Immunity to Shield Publishers from Liability for Publishing and Policing Third Party Content. ...............28

    B.    Yelp Is Immune from Claims Arising from Its Publication Decisions Under CDA Section 230(c)(1). ..........................31

II.    PLAINTIFFS' ALLEGATIONS ARE WHOLLY SPECULATIVE AND FAIL TO SET FORTH A PLAUSIBLE UCL OR EXTORTION CLAIM. ..........................................................47

ii

A. Plaintiffs Fail to Allege a Legally Sufficient Claim for Extortion or Attempted Extortion. ...................................................47

CONCLUSION .........................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A-1 Technology, Inc. v. Megedson*,
No. 150033/10, Slip Op. at 3 (N.Y. Sup. Ct. June 22, 2011) .............................44

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................ 22, 25, 32

*Asia Econ. Inst. v. Xcentric Ventures LLC*,
No. CV 10-01360 SVW PJWx), 2011 WL 2469822 (C.D. Cal. May 4,
2011) ...............................................................................................................44

*Balistreri v. Pacifica Police Dept.*,
901 F.2d 696 (9th Cir. 1988) .........................................................................22

*Barnes v. Yahoo!*, Inc.,
570 F.3d 1096 (9th Cir. 2009) ............................................................... passim

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) .......................................................................45

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......................................................................................22

*Blumenthal v. Drudge*,
992 F. Supp. 44 (D.D.C. 1998) ......................................................................40

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003) ................................................... 23, 33, 43, 45

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ...................................................................................54

*Chateau Hip, Inc. v. Gilhuly*,
No. 95 Civ. 10320 (JGK), 1996 WL 437929 (S.D.N.Y. Aug. 2, 1996) ...............8

*Clegg v. Cult Awareness Network*,
18 F.3d 752 (9th Cir. 1994) ...........................................................................23

*Daugherty v. Am. Honda Motor Co.*,
144 Cal. App. 4th 824 (2006) ........................................................................53

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) ............................................................... passim

iv

*Gentry v. eBay*,
    99 Cal.App.4th 816, 834 (2002) ..........................................................................44

*McDonald v. Coldwell Banker*,
    543 F.3d 498 (9th Cir. 2008) .............................................................................54

*Miami Herald Publ'ing Co. v. Tornillo*,
    418 U.S. 241 (1974) ..........................................................................................35

*Mitchell v. Sharon*,
    59 F. 980 (9th Cir. 1894) ........................................................................... 25, 47

*Navarro v. Block*,
    250 F.3d 729 (9th Cir. 2001) .............................................................................22

*People v. Sales*,
    116 Cal. App. 4th 741 (2004) ..................................................................... 25, 47

*Petrochem Insulation, Inc. v. N. Cal. & N. Nev. Pipe Trades Counsel*,
    No. C-90-3628 EFL, 1991 WL 158701 (N.D. Cal. Apr. 30, 1991) ...................48

*Rothman v. Vedder Park Mgmt.*,
    912 F.2d 315 (9th Cir. 1990) .............................................................................49

*Sigmund v. Brown*,
    645 F. Supp. 243 (C.D. Cal. 1986) ...................................................................50

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ...................................................................... 25, 49

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001*)* ...........................................................................22

*United States v. Capo*,
    817 F.2d 947 (2d Cir. 1987) ..............................................................................50

*United States v. Tomblin*,
    46 F.3d 1369 (5th Cir. 1995) .............................................................................50

*Warren v. Fox Family Worldwide, Inc.*,
    171 F. Supp. 2d 10575 (C.D. Cal. 2001) .............................................................8

*Wilson v. Hewlett-Packard Co.*,
    668 F.3d 1136 (9th Cir. 2012) ...........................................................................22

*Zeran v. America Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) ...................................................... 2, 29, 35, 47

**Statutes**

18 U.S.C. § 1951(b)(2) ........................................................48

47 U.S.C. § 230(c)(1) ........................................... 23, 26, 28, 37

47 U.S.C. § 230(c)(2) ........................................................27

47 U.S.C. § 230(f)(2) ........................................................26

Cal. Bus. & Prof. Code § 17200 ..........................................53

Cal. Penal Code § 518 ......................................................48

Cal. Penal Code § 524 ......................................................48

**Other Authorities**

S. Rep. No. 104-230 (1996) (Conf. Rep.), *available at* 1996 WL 54191 ..............29

**Regulations**

16 C.F.R. 255 ...............................................................4

# INTRODUCTION

Yelp is a leading Internet review website that allows members of the public to read and create online reviews about their experiences with local businesses.[1] The integrity of these reviews has fueled the success of Yelp's service, and Yelp goes to great lengths to combat attempts (including by many of the Plaintiffs) to post or solicit bogus reviews—such as sham "5-star" reviews planted by a business owner promoting its own business. As Plaintiffs acknowledge, Yelp employs a proprietary, automated software algorithm that filters consumer reviews which it identifies as potentially unreliable from the tens of millions of reviews that are posted on its website, regardless of whether those reviews are positive or negative or are written about businesses that advertise with Yelp.

Plaintiffs are a group of disgruntled business owners who seek to suppress this legitimate, protected online commentary and to prevent Yelp from exercising its right to screen reviews which may be false or unreliable. Having tried and abandoned various theories in an attempt to state a viable cause of action, Plaintiffs' Third Amended Complaint—the *sixth* filed before the district court dismissed this case with prejudice—attempted to portray Yelp's editorial decisions as "extortion," even as it failed to make a single allegation of any actual or implied

---

[1] Yelp averaged roughly 66 million monthly unique visitors in the fourth quarter of 2011.

threat.  Instead, Plaintiffs' claims rest entirely on speculative inferences about the publication and removal of reviews created by third-party users of Yelp's service. As the district court correctly held, the conduct that Plaintiffs complain about—the decisions whether to publish or remove third-party ratings and reviews—is squarely protected by Section 230 of the Communications Decency Act ("CDA").

Plaintiffs' suggestion that this Court must somehow find that the CDA shields "extortion" to uphold the district court's well-reasoned decision is a straw man.  The question in this case is not whether the CDA immunizes extortion (it does not), but whether Plaintiffs may ground an extortion claim against Yelp solely on its exercise of traditional publishing functions on the Internet, in the absence of any explicit threat.  They cannot.  Plaintiffs' claims, which conspicuously fail to allege *any* actual threat, are simply an attempted end run around well-settled Ninth Circuit authority finding that "all publication decisions, whether to edit, to remove, or to post" content generated by others online are shielded from liability.  *See Barnes v. Yahoo!*, Inc., 570 F.3d 1096, 1105 (9th Cir. 2009).

Indeed, encouraging online publishers to "self regulate" third-party content—in Yelp's case, though the use of software applied equally to all reviews (a necessity on a site with tens of millions of constantly changing reviews)—is the core purpose of CDA immunity.  *See Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997).  Plaintiffs' efforts to penalize these screening activities—and

2

to peer into the reasons behind each of millions of automated publication decisions—conflicts with the letter and purpose of the broad immunity CDA 230(c)(1) explicitly grants.

Finally, even if Plaintiffs' claims were not barred by CDA Section 230, they still fail to set forth a "plausible claim for relief." ER 371:26-27; 389:17. As Judge Patel found when dismissing the Second Amended Complaint, and Judge Chen confirmed in dismissing the Third Amended Complaint, Plaintiffs failed to plausibly allege that Yelp engaged in any "deliberate manipulation" of user reviews, much less "extortion," since it was not possible to "reasonably attribute the appearance and disappearance of various user reviews to Yelp's wrongdoing as opposed to its efforts to filter out unreliable reviews." ER 389:8-9; 8:11-18.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  YELP'S CONSUMER REVIEW PLATFORM

Yelp's review website draws tens of millions of visitors each month. ER 344:12. Once there, users may rate (on a scale of one to five stars) and post reviews about local businesses, as well as view ratings and reviews posted by other users. ER 344:8-13. Yelp's business model depends on continuing to draw users to its website by showcasing the most reliable reviews submitted to its website. ER 344:14-16. Because Yelp would not be a useful consumer resource if businesses could simply remove themselves from public commentary on the

website, businesses cannot opt out of being listed on Yelp, or prevent consumers from posting particular reviews about their businesses. ER 348:10-15.

While the majority of reviews and ratings on Yelp are positive (three stars or above), businesses with negative ratings on Yelp obviously would prefer that those ratings be removed and that users be prevented from posting negative reviews. As indicated in the pleadings, business owners (including the Plaintiffs) who do not like public commentary about their businesses on Yelp regularly contact Yelp or its users demanding removal or changes to that content. ER 351:5-353:15; see also ER 223:22-224:2. Yelp does not remove or change user reviews in response to such business requests (whether or not the business advertises) but may remove reviews that violate its Terms of Service or Content Guidelines.

Unreliable reviews—often, 5-star reviews planted by business owners, or their proxies, about their own businesses—are the single biggest threat to the integrity of Yelp's service.[2] To help it show the highest quality reviews, Yelp relies on a proprietary, automated software filter to detect potentially unreliable reviews, as it must to combat abuse and attempts to commit fraud on a website

---

[2] This problem is not unique to Yelp. In 2009, the Federal Trade Commission published Guides Concerning the Use of Endorsements and Testimonials in Advertising specifically to address the problem of misleading online reviews, and to make clear that businesses may be held responsible for posting sham reviews endorsing their own products or services which fail to disclose the source of the endorsement. *See* 16 C.F.R. 255.

4

with more than 25 million user-posted reviews. Yelp clearly disclosed the use of this algorithm to businesses (including Plaintiffs) and consumers:

> This system decides how established a particular reviewer is and whether a review will be shown based on the reviewer's involvement with Yelp. While this may seem unfair to you, this system is designed to protect both consumers and businesses alike from fake reviews (i.e., a malicious review from a competitor or a planted review from an employee). The process is entirely automated to avoid human bias, and it affects both positive and negative reviews. It's important to note that these reviews are not deleted (they are always shown on the reviewer's public profile) and may reappear on your business page in the future.

ER 345:7-14 (quoting Yelp's website). Yelp also discloses that it may remove reviews that violate its Terms of Service or Content Guidelines, and that a review may also be removed at any time by the user who wrote it. ER 345:4-14.

To support its free website, Yelp also offers certain well-defined benefits to advertisers, aimed at increasing their exposure to Yelp's sizeable user base. ER 344:20-345:3. Historically, businesses that advertised with Yelp could increase their visibility by (1) appearing in advertisements displayed *above* search results (thus, a local pizzeria that advertised could be displayed above search results if a user searched for "pizza", for example); (2) preventing competitors' advertisements from appearing on their business's page on Yelp; (3) enhancing their business's page on Yelp with a photo slideshow, and (4) "promot[ing] a favorite review at the top of their Yelp page." ER 344:20-345:3. These features

5

have changed somewhat over time, and Yelp now offers new benefits, like a video feature, and has discontinued others, like the ability to highlight a "favorite review."

Yelp specifically tells potential advertisers that they cannot change, remove or reorder reviews about their businesses, and also reiterates that Yelp has an automated filter that may suppress reviews, both positive and negative. ER 344:20-345:3.

## II.    PLAINTIFFS' ALLEGATIONS

Plaintiffs' claims have been a moving target, and they have filed no fewer than six different pleadings in an attempt to state a viable theory against Yelp. After trying and abandoning claims for false advertising and intentional interference in the First Amended Complaint, Plaintiffs now claim that, even though Yelp (1) has invested extensive resources in developing an automated software filter in order to ensure that reviews appearing on its website are trustworthy; (2) explicitly offers specific, limited benefits to businesses who purchase advertising subscriptions; and (3) directly explains to potential advertisers that Yelp *cannot* change or reorder any reviews, Yelp nonetheless secretly "manipulate[s] the reviews of businesses nationwide to instill fear in businesses that if they do not purchase advertising, Yelp will manipulate their reviews . . . ." ER 345:15-346:3.

6

Importantly, Plaintiffs nowhere allege that Yelp ever communicated, directly or by implication, a threat to post any negative review, or to remove any positive review, or to otherwise manipulate the reviews that appear on a business page—whether or not a business advertised. Nor do Plaintiffs allege that Yelp ever threatened to unlawfully harm any of the Plaintiffs (or anyone) unless they advertised on Yelp. Instead, Plaintiffs contend that the removal of positive reviews and "appearance" of negative reviews on their business pages—in and of itself—caused them to "fear" that they would be harmed (in the form of negative user reviews and star ratings) unless they advertised. *See, e.g.,* ER 345:15-346:8; 352:18-24; 354:21-23; 356:22-25; 358:19-22.

The Third Amended Complaint purports to encompass both "Sponsor" plaintiffs (who did not purchase advertising) and "Non-Sponsor" plaintiffs (who did purchase advertising). ER 348:27-349:2. In turn, these Plaintiffs proposed to represent classes consisting both of business that advertised on Yelp and those that did not—belying any notion that the publication or removal of consumer reviews about a business was related to whether or not it purchased advertising. ER 361:8-362:3.

### A.    Non-Sponsor Plaintiffs:

#### 1.    Plaintiff Boris Levitt

Boris Levitt, owner of Renaissance Furniture Restoration, complains that

7

positive reviews were removed from his business page both before and after he received an offer to purchase advertising on Yelp. ER 351:1-10, 21-26. Levitt alleges that he initiated contact with Yelp's customer service team in May 2009 to "inquire about why a positive review of his business had disappeared." *Id.* A representative of Yelp informed him (correctly) that she could not "assist him in removing [sic] the [positive] review." ER 351:5-8. In earlier pleadings, Levitt explained that this representative had informed him that Yelp uses an "automated system that decides how much trust to instill in a particular reviewer" and that may remove or reinstate reviews, but that Yelp employees "don't have the ability to evaluate or reinstate specific reviews" that are filtered.[3] SER 7:24-8:15.

Levitt alleges that he was contacted a few months later by a Yelp sales representative, who suggested (again, accurately) that Levitt could increase his "page views" by advertising on Yelp. ER 351:11-18. "In response," Levitt declined to advertise because he already had a "high volume of users reviewing his business page" and a "rating of 4.5 stars" (despite not advertising). ER 351:11-18.

---

[3] Levitt removed these admissions from the Second and Third Amended Complaints, apparently to obscure the fact that Yelp truthfully informed him that it could not manipulate reviews on his behalf. The Court should consider these allegations on appeal. *See Warren v. Fox Family Worldwide, Inc.*, 171 F. Supp. 2d 1057, 1060 n.5 (C.D. Cal. 2001) (plaintiffs' allegations in prior pleading are party admissions); *Chateau Hip, Inc. v. Gilhuly*, No. 95 Civ. 10320 (JGK), 1996 WL 437929, at *6 (S.D.N.Y. Aug. 2, 1996) ("[T]hat more complete allegations have been deliberately omitted from the Second Amended Complaint to avoid a motion to dismiss raises serious questions as to the good faith basis for a claim….").

Levitt contends that after he declined to advertise on Yelp, unidentified additional 5-star reviews were removed from his business page—conditions that also existed months *before* he declined to advertise on Yelp. ER 351:1-8, 11-18, 21-26. Levitt fails to allege any facts suggesting that these reviews were removed by any means other than the normal operation of Yelp's automated review filter. ER 344:20-345:14. Instead, Levitt alleges "[u]pon information and belief," that "Yelp manipulated the reviews of Levitt's business because he did not purchase advertising," despite paradoxically conceding that he received negative reviews, and lost positive reviews, months before declining to advertise. ER 351:1-10, 352:1-4.

### 2. Plaintiff Cats & Dogs Animal Hospital

Cats & Dogs Animal Hospital ("C&D") focuses on two negative consumer reviews it received before receiving an offer to advertise on Yelp. ER 353:7-8, 18-25. Specifically, C&D alleges that it first contacted Yelp in September 2009 to request removal of a review alleged to be "negative" and "possibl[y] fals[e]." ER 353:7-11. Thereafter, the negative review was "removed," even though C&D did not advertise. ER 353:12-17. C&D then alleges it received a second negative review. ER 353:18-25.

C&D claims that *four months later* it received a sales call from "Kevin," who allegedly offered various advertising benefits, including the ability to "hide

negative reviews" or "place them lower on the listing page" (allegations Yelp vigorously denies). ER 354:3-15. C&D "declined the [alleged] offer, saying that [it] wanted to track referrals from Yelp . . . without ads." ER 354:16-17. In its earlier complaint, C&D contended that after it declined to advertise with Yelp, "highly negative, inflammatory" reviews continued to reappear on its business page, just as they had before, but that Yelp was unwilling to remove these reviews—consistent with its stated policies. ER 565:1-8. Specifically, Yelp advised that it was unable to remove these customer reviews because it did not "have firsthand knowledge of a reviewer's identity or personal experience" and was "not in a position to verify [C&D's] claims that these reviewers . . . are connected to the recent vandalism at your hospital"—and *not* because C&D had declined advertising. ER 565:3-8.

C&D speculates that '[a]s a result of Yelp's conduct"—i.e. its refusal to remove negative, third-party reviews—it received "fewer customers" and a "decrease in business revenues." ER 355:14-18. C&D further alleges that "negative reviews" posted by third-party customers—and not any unlawful conduct by Yelp—harmed its "business's reputation." *Id.* Yet in earlier pleadings, C&D conceded that after *declining* to advertise with Yelp, it nevertheless "enjoyed a 4-star rating" on Yelp, with more than 60% of reviews giving it "a perfect 5-star

10

rating"—admissions C&D conspicuously removed from subsequent complaints because they conflict with its baseless theory.  SER 11:20-22.

### 3.    Plaintiff Wheel Techniques

Wheel Techniques complains that an unspecified number of "negative reviews" appeared on its Yelp page in "late 2008 and early 2009"—more than *one year* before Wheel Techniques was contacted by Yelp to purchase advertising.  ER 355:22-356:4, 356:16-18.  Wheel Techniques contends that it has "no record of the names" of these unidentified reviewers (who, by convention, are identified on Yelp by first name and last initial), and cites as a single example a review posted by "Kevin T." that appeared on its business page on March 5, 2009.  ER 355:22-356:4, 356:16-21.  Based entirely on its claim that it could not locate records for "Kevin T." or for a weld job "during or around the time period" of the review, Wheel Techniques speculates "[u]pon information and belief" that "Yelp employees or individuals acting on behalf of Yelp posted some or all of the false reviews" as a "threat to induce Wheel Techniques to advertise."  ER 356:7-10.  Wheel Techniques failed to point to a single fact that supports this conclusion, nor made any effort to explain why its purported inability to locate records relating to "Kevin T." in its files could not be explained by any number of more plausible facts, including poor record keeping, "Kevin T.'s" use of a different name when

11

contracting for service, or a delay between the date of service and the date of the review.

At "[a]round the same time" as Kevin T.'s review, Wheel Techniques vaguely claims that it received sales calls from Yelp. ER 356:5-6. But Wheel Techniques specifically alleges that more than one year after "Kevin T." posted a negative review, Wheel Techniques was "contacted by Yelp to purchase advertising." *Id.* (alleging contact on March 8, 2010). Wheel Techniques does not allege that Yelp threatened to harm Wheel Techniques' business unless it advertised. Instead, it claims that after it "declined to purchase advertising," an unspecified "one-star review was moved to the top of its Yelp review page." ER 356:19-21.

Wheel Techniques also does not allege that Yelp in any way created or manipulated the content of this single, one-star review. Instead, it contends "[u]pon information and belief" that Yelp "placed" (i.e., published) the review "at the top of the Wheel Techniques review page as a threat to cause Wheel Techniques to fear that" unless it advertised, "the negative review would remain at the top of its Yelp review page and/or additional negative reviews would appear…." ER 356:22-25. Wheel Techniques provides no support for the notion that Yelp published this single review "as a threat," and in no way explains why the appearance of this single one-star review at the top of Wheel Techniques'

12

review page was not entirely consistent with the operation of Yelp's review filter software or the result of a user posting a negative review about his experience with Wheel Techniques.

Wheel Techniques also claims that at some point "[i]n 2009," it "called Yelp" to complain that its overall star rating was "2.5 or 3 stars" while one of its unnamed "competitors"—which Wheel Techniques contends performs "shotty work"—had an overall star rating of five stars. ER 356:11-15. Wheel Techniques claims that an unnamed Yelp employee informed it that the competitor advertised and that Yelp would "work with your reviews if you advertise with us"—but does not allege that this or any other employee stated or implied that Yelp would harm Wheel Techniques unless it advertised. *Id.*

Finally, Wheel Techniques claims that it "was told several times" (it does not say by whom) "that a former Yelp employee stated that Yelp, upon information and belief" fired a "group of sales employees" for engaging in unspecified "scamming relating to advertising" and "froz[e]" the "computers of sales employees . . . to prohibit employees from being able to change reviews." ER 356:26-357:3. It does not identify the source of these alleged rumors, much less allege that these claims are in any way connected to Plaintiffs. (Furthermore, there is no factual basis to these triple hearsay allegations, which—ironically—defeat Plaintiffs' claim that Yelp had a "policy" of manipulating reviews.)

13

**B.    Sponsor Plaintiff: Tracy Chan**

Plaintiff Chan alleges that a Yelp representative supposedly called to "offer her lots of benefits" if she advertised on Yelp, such as the opportunity to "hid[e] or bury[] bad reviews" and to "put pictures on the Yelp page." ER 357:19-26. Chan concedes that she "ultimately declined to purchase Yelp advertising" in response to these purported offers (which Yelp denies were made). ER 358:4-5.

Chan complains that, thereafter, various "5-star reviews" were removed from her business's page—although, like the other Plaintiffs, she fails to allege facts indicating that these reviews were removed due to anything other than the normal operation of Yelp's review filter. ER 358:6-9.

In earlier pleadings, Chan alleged that several months *after* speaking with Yelp about advertising, she elected to purchase advertising due to "months of experiencing a decline in new patients," and not due to any alleged threats by Yelp. SER 13:8-11. Chan now asserts that before purchasing advertising, she had a further conversation with Yelp—conspicuously absent from her earlier pleadings—in which a Yelp representative purportedly told her that Yelp occasionally "tweaks" ratings and could "help her" in unspecified ways if she advertised. ER 358:10-13. Based on these added allegations, Chan asserts that she "believed" Yelp "manipulated" reviews about her business and that she purchased advertising on Yelp "so that Yelp would reinstate the positive reviews" and stop

14

"the posting of negative reviews" by consumers—even though Yelp specifically tells advertisers that it is unable to change the reviews that appear on their business page.  ER 358:14-26.  Chan does not allege that any representative of Yelp ever threatened or even suggested that Yelp would harm Chan's business or manipulate reviews if she did not advertise on Yelp.

Chan signed a one-year contract with Yelp "for advertising" in early August 2008.  ER 358:19-26.  Nowhere does Chan allege that she failed to receive the benefits specified in her contract with Yelp.  Instead, Chan alleges that her "overall star rating" initially increased after purchasing advertising, but declined shortly thereafter—defeating the spurious premise that Yelp somehow manipulates reviews in favor of advertisers.  ER 358:14-359:3.

In the Second Amended Complaint, Chan also claimed for the first time that after entering into a one-year advertising contract, a Yelp salesperson requested that she make an "increased payment" for advertising with Yelp.  ER 567:16-18.  Chan fails to specify the additional benefits she supposedly was offered by this representative, and again, fails to allege that Yelp in any way threatened to harm or manipulate reviews for Chan's business unless she increased her advertising commitment with Yelp.  ER 359:1-3.

Chan cancelled her one-year advertising contract in October 2008, just two months after advertising on Yelp, and in the face of consumer reviews that were

15

"again declining"—even though she advertised. ER 359:1-11. Chan complains that some time after she stopped advertising, positive reviews were removed from her business page, while negative consumer reviews continued to appear, just as they had during the brief period that she advertised. ER 359:4-11. Although Chan adds allegations "on information and belief" that Yelp somehow removed the positive reviews to "cause Chan to fear" that it would remove positive reviews unless she paid for advertising, she alleges no facts that in any way support this claim, nor does she point to any statement or conduct by Yelp that could reasonably have contributed to this belief. ER 359:4-19.

Ultimately, Chan complains that during the 18 months after she stopped advertising on Yelp, several positive reviews were removed from her business page (as was the case before and during the period she advertised on Yelp), and that her "overall star rating…dropped"—although she again fails to allege any facts demonstrating that the removal of these reviews, or the publishing of negative consumer reviews, was in any way unlawful. ER 357:17-358:9.

## III. PROCEDURAL HISTORY

The TAC is the *sixth* pleading to be filed in this consolidated action. After the district court appointed lead counsel and ordered Plaintiffs to file a consolidated amended complaint, Plaintiffs filed the First Amended Complaint alleging claims for violations of the California's Unfair Competition Law (Cal.

16

Bus. & Prof. Code § 17200, *et seq.*) ("UCL"), California's False Advertising Law, and intentional interference with prospective business advantage, alleging that Yelp had engaged in "deceptive statements and misrepresentations to business owners" to induce them to advertise on Yelp. *See, e.g.*, SER 18:9-10, 20:4-13. After Yelp moved to dismiss the First Amended Complaint, Plaintiffs sought to amend their pleading, and remove all claims of "false" and "deceptive" conduct under the UCL and False Advertising Law, as well as the intentional interference claim. In the Second Amended Complaint, Plaintiffs changed tack and focused on a different theory, premised entirely on unsubstantiated claims of "extortion" or "attempted extortion." ER 573:21-575:18.

**A.** **Order Dismissing Second Amended Complaint**

On March 22, 2011, the district court (the Honorable Marilyn Hall Patel then presiding) dismissed Plaintiffs' Second Amended Complaint for failure to state a claim upon which relief could be granted. The court concluded that Plaintiffs failed to state a claim under the unlawful prong of the UCL because (1) it was "entirely speculative that Yelp manufactures its own negative reviews or deliberately manipulates reviews to the detriment of businesses who refuse to purchase advertising," and (2) the SAC lacked "factual allegations from which any distinct communication of a threat might be inferred." ER 386. In other words,

17

the SAC had "fail[ed] to plausibly allege that any of Yelp's conduct amounted to an implied extortionate threat. *Id.*

With respect to the unfair prong of § 17200, to the extent not based on rejected theories of extortion, the court found that Plaintiffs' claims failed because (1) they "point to no legislatively declared policy allegedly contravened by Yelp," (2) they fail to "allege beyond a speculative level that Yelp's actions threaten competition," and (3) there are no allegations from which the court could reasonably infer that Yelp is materially tilting the economic playing field in favor of plaintiffs' competitors."  ER 388-39.

In dismissing the SAC, the district court also discussed, "[a]s a preliminary matter," Yelp's potential immunity under the CDA.  ER 383:25-26.  The court observed that "to the extent that the extortion claim is premised on Yelp's failure to remove negative reviews . . . this activity is clearly immunized by the CDA." *Id.*  The court further observed that Plaintiffs' claims that Yelp manufactured the content of negative reviews were "potentially actionable" if properly alleged because the CDA does not "preclude liability stemming from Yelp's own alleged postings, from statements made by its ad salespersons, or from Yelp's deliberate manipulation of customer reviews."  ER 384:19-27.  Finally, the court suggested that it might be "[a] closer question . . . whether Yelp may be held liable for its removal of positive reviews" and in support of this observation cited a handful of

18

cases that—critically—discussed immunity deriving from CDA § 230(c)(2), *not* CDA § 230(c)(1).  ER 385:6-386:5; *see also infra,* n. 6.  But the court deferred these questions for a later day, because "[r]egardless, the SAC fail[ed] to plausibly allege that any of Yelp's conduct amounted to an implied extortionate threat."  The court dismissed the SAC with leave to amend.  ER 386:6-10.

### B.  Order Dismissing Third Amended Complaint With Prejudice

Plaintiffs filed their TAC on May 23, 2011.  The TAC was largely identical to the SAC, aside from: (1) replacing Plaintiff Paver Pro, which had appeared for the first time in SAC, with new Plaintiff Wheel Techniques; (2) adding the non-specific allegation that "approximately 200 Yelp employees or individuals acting on behalf of Yelp have written reviews of businesses on Yelp," ER 349:21-22; and (3) adding an allegation that Yelp's CEO stated to a New York Times blog that "Yelp has paid users to write reviews," ER 349:23-350:2.

Following Judge Patel's decision dismissing the SAC, the case was reassigned to Judge Edward Chen on June 6, 2011.  On October 26, 2011, the district court dismissed the TAC with prejudice, finding that the TAC failed to state a claim under either the unlawful or unfair prongs of the UCL or to state a claim of civil extortion or attempted civil extortion.

In particular, the district court found that it was "'entirely speculative that Yelp manufactures its own reviews or deliberately manipulates reviews to the detriment of businesses who refuse to purchase advertising' and 'the TAC provides no basis from which to infer that Yelp authored or manipulated the content of the negative reviews complained of by plaintiffs.'"  ER 8 (quoting ER 386).  The court further explained that Plaintiffs' newly-added allegations did not raise more than a speculative possibility that Yelp employees created or altered the content of Plaintiffs' reviews.  ER 8-9 (quoting ER 355:22-356:4).

With respect to the allegations based on Yelp's purported "manipulation" of user-generated content, the court correctly concluded that the CDA barred Plaintiffs' claims.  ER 9.  Specifically, the court found that claims of extortion based on Yelp's alleged conduct in removing certain reviews and publishing others, or in changing the order of reviews, are barred by Section 230(c)(1), and that the aggregate star rating does not constitute editorial content created by Yelp because it is merely an aggregation of user-generated data.  *Id.*

The court further rejected Plaintiffs' arguments to the extent they challenged Yelp's alleged *motive* in vetting the reviews, affirming that whereas Section 230(c)(2) immunity requires a showing of "good faith", courts may not scrutinize the purposes or motives behind a publisher's exercise of traditional publishing or editorial functions under Section 230(c)(1).  The court cautioned that

20

finding a bad faith exception to immunity under § 230(c)(1) could force Yelp to defend its editorial decisions in the future on a case by case basis and reveal how it decides what to publish and what not to publish. Such exposure could lead Yelp to resist filtering out false/unreliable reviews (as someone could claim an improper motive for its decision), or to immediately remove all negative reviews about which businesses complained (as failure to do so could exposure Yelp to a business's claim that Yelp was strong-arming the business for advertising money).

ER 13.

### C. Factual Challenge To Plaintiffs' Article III Standing Under Fed. R. Civ. P. 12(b)(1)

While affirming that Yelp's publishing activity was entitled to immunity under the CDA, the court rejected Yelp's motion to dismiss for lack of standing under Rule 12(b)(1). In support of its motion, Yelp presented unrebutted evidence that at least some of the "fluctuations" in Plaintiffs' ratings were attributable to Plaintiffs' repeated efforts to post fake positive reviews about their own businesses—and not to any "deliberate manipulation" by Yelp. ER 222-26. The district court considered this evidence—including facts that (i) six of the positive reviews removed from Plaintiff Wheel Techniques' business page were reviews written and posted by the owner of Wheel Techniques; (ii) a positive review removed from Plaintiff Levitt's business page was written and posted by Levitt, (iii) Plaintiff Wheel Techniques had contacted a user who posted a negative review about its business threatening to sue the user unless he removed the review; and (iv) and numerous other reviews (both positive and negative) were removed from

21

Plaintiffs' business pages for other unambiguous violations of Yelp's Terms of

Service—but ultimately  found "the standing issue [] too intertwined with the

merits of Plaintiffs' claims to be determined at this stage on the basis of a factual

challenge."  ER 222-26; ER 5; *see also* Appellants' Br. at 53.

## STANDARD OF REVIEW

The court reviews *de novo* a dismissal for failure to state a claim under

Federal Rule of Civil Procedure 12(b)(6).  *Wilson v. Hewlett-Packard Co.*, 668

F.3d 1136, 1140 (9th Cir. 2012).  A motion to dismiss "tests the legal sufficiency

of a claim."  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Dismissal may

be based on the lack of a cognizable legal theory or the absence of sufficient facts

alleged under a cognizable legal theory.  *Balistreri v. Pacifica Police Dept.*, 901

F.2d 696, 699 (9th Cir. 1988).  A motion to dismiss should be granted if a plaintiff

fails to plead "enough facts to state a claim to relief that is plausible on its face."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "The plausibility standard

is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009) (quoting *Twombly*, 550 U.S. at 556).  The court need not accept as true

pleadings that are no more than legal conclusions or the "formulaic recitation of

the elements" of a cause of action.  *Iqbal*, 556 U.S. at 681, *see also )Sprewell v.*

22

*Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001*; Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

## SUMMARY OF ARGUMENT

Yelp's publication and removal of user-generated reviews is protected by CDA Section 230(c)(1), which provides that no interactive computer service may be held liable based on content provided by another information content provider. 47 U.S.C. § 230(c)(1). "Subsection (c)(1), by itself, shields from liability *all publication decisions, whether to edit, to remove, or to* post, with respect to content generated entirely by third parties." See *Barnes*, 570 F.3d at 1105 (emphasis supplied). Plaintiffs failed to allege any facts that plausibly suggest that Yelp created the content of any of the reviews or ratings that give rise to their claims or that Yelp functioned as an "information content provider" outside the protections of CDA Section 230(c)(1). *See Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1125 (9th Cir. 2003) (CDA 2003 immunity applies unless defendant "created or developed the particular information at issue.").

Plaintiffs cannot circumvent Yelp's immunity merely by engaging in speculation about Yelp's motives in exercising protected editorial functions. Unlike the immunity afforded under subsection (c)(2) which requires a showing that a publisher's actions were taken in "good faith," the inquiry under (c)(1) does

23

not permit evaluation of a publishers' motives when engaging in traditional publisher functions. *See Barnes*, 570 F.3d at 1105.

Nor does mere aggregation of user-generated content in a summary star rating deprive Yelp of protection under the CDA. *See Carafano v. Metrosplash.com Inc.*, 339 F.3d 119, 1124 (9th Cir. 2003) ("[S]o long as a third party willing provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process."). Penalizing Yelp for exercising protected publication decisions—whether to publish or remove individual user reviews—merely because those decisions are reflected in a summary star rating would authorize an unfair end run around Section 230's protections. This Court sitting en banc has emphasized that "close cases . . . *must be resolved in favor of immunity*, lest we cut the heart out of section 230 . . . ." *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008) (en banc) (emphasis added).

Even if the CDA did not shield Yelp from liability stemming from its online publishing decisions—and it clearly does—the district court's Order still should be affirmed because Plaintiffs failed to allege that Yelp threatened them with unlawful injury or engaged in the wrongful use of fear, as required to plead extortion (or a derivative UCL claim) under California or federal law. *See Mitchell v. Sharon*, 59

24

F. 980, 982 (9th Cir. 1894); *People v. Sales*, 116 Cal. App. 4th 741, 751 (2004)

(reversing attempted extortion conviction because "extortion requires a threat").

Alleged statements by Yelp's sales team offering Plaintiffs benefits if they

advertised cannot establish a threat as a matter of law because they do not contain

any threat of unlawful injury or "wrongful use of … fear." *See Sosa v. DIRECTV,*

*Inc.*, 437 F.3d 923, 939 (9th Cir. 2006). Stripped of these innocuous statements,

Plaintiffs' claims rest entirely on speculative inferences based on the alleged

timing of the removal and publication of third-party reviews on individual business

pages. Their claims are factually unsupported as a matter of law. *See Iqbal*, 556

U.S. at 681.

## ARGUMENT

## I. YELP'S PUBLISHING ACTIVITIES ARE SHIELDED FROM LIABILITY UNDER COMMUNICATIONS DECENCY ACT SECTION 230.

Plaintiffs' appeal asserts three principal theories: (1) that the district court

erred in finding that there were no factual allegations supporting their claims that

Yelp authored user reviews, *see, e.g.,* Appellants' Br. at 23; (2) that Yelp is not

entitled to CDA immunity for the removal of positive reviews, *see id.* at 28; and

(3) that Yelp is not entitled to CDA immunity based on Yelp's display of a "star

rating" that is based entirely on the user-generated content that Yelp's review filter

25

algorithm considers appropriate to publish, *see id.* at 14-15. Each of these theories fails to establish a basis for reversing the district court's well-reasoned decisions.

Contrary to Plaintiffs' positions, Yelp's removal of third-party user reviews and display of a user-generated star rating is squarely immune under CDA Section 230, which contains two distinct provisions insulating online publishers like Yelp from liability for engaging in publisher functions.

Specifically, Section 230(c)(1) provides:

(1)  Treatment of publisher or speaker

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

47 U.S.C. § 230(c)(1). It is undisputed that Yelp is an "interactive computer service," which is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server . . . ." 47 U.S.C. § 230(c)(1) & (f)(2).

"Subsection (c)(1), by itself, shields from liability *all publication decisions, whether to edit, to remove, or to* post, with respect to content generated entirely by third parties." *See Barnes*, 570 F.3d at 1105 (emphasis supplied). Thus, under subsection (c)(1), Yelp is immunized from liability for its decisions to post and remove positive reviews or publish user-generated ratings, since Plaintiffs do not

26

allege any facts showing that Yelp generated the "content" of those reviews or ratings.  *Id.*

Separately, subsection (c)(2) provides a distinct immunity for certain actions taken by an interactive computer service "in good faith."  Specifically, subsection (c)(2) provides:

> (2)  Civil liability
>
> No provider or user of an interactive computer service shall be held liable on account of—
>
> (A)  any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected.

47 U.S.C. § 230(c)(2).

Each of these immunity provisions is distinct and independent.  See *Barnes*, 570 F.3d at 1105 ("Subsection (c)(2), for its part, provides an additional shield from liability . . . not merely [for] those whom subsection (c)(1) already protects, but [for] any provider of an interactive computer service.").  In other words, an interactive computer service provider who fits within the immunity provided by subsection (c)(1) need not also meet (but may meet) the requirements of subsection (c)(2), and vice versa.  Although subsection (c)(2) would independently protect Yelp from liability for its filtering activities and use of an automated filter to suppress unreliable reviews since there is no plausible allegation that Yelp lacked

27

"good faith" when it engaged in these activities, the district court correctly held that Yelp is entitled to immunity under subsection (c)(1).

Moreover, as Plaintiffs concede, subsection (c)(1)—unlike subsection (c)(2)—does not require that the actions of an interactive computer service were taken in "good faith" or otherwise permit consideration of a publisher's motives or intent when assessing whether the publisher is subject to liability relating to its publication decisions. Appellants' Br. at 31; 47 U.S.C. § 230(c)(1).

### A. Congress Created CDA Immunity to Shield Publishers from Liability for Publishing and Policing Third Party Content.

The core purpose of Section 230 is to encourage online service providers to publish and police user-generated content—as Yelp does—without fear of liability or costly litigation. The legislation was enacted in direct response to a New York state court decision, *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), which involved claims against an interactive computer service for defamatory comments made by an unidentified party on its online bulletin board. The *Stratton Oakmont* court held Prodigy to the strict liability standard historically applied to original publishers of defamatory statements because Prodigy had actively screened and edited messages posted on its bulletin boards. *Id.*

"Congress enacted § 230 to remove the disincentives to self regulation created by the *Stratton Oakmont* decision." *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997). Section 230 thus forbids imposition of publisher liability on an Internet service provider for the exercise of editorial and screening functions:

> [S]ection [230] provides 'Good Samaritan' protection from civil liability for providers . . . of an interactive computer service for actions to restrict . . . access to objectionable online material. One of the specific purposes of this section is to overrule *Stratton-Oakmont [sic] v. Prodigy* and any other similar decisions which have treated such providers . . . as publishers or speakers of content that is not their own because they have restricted access to objectionable material.

S. Rep. No. 104-230, at 86 (1996) (Conf. Rep.), *available at* 1996 WL 54191, at *172.

In finding that Section 230 shields Yelp from liability relating to its publishing decisions and use of an automated software filter, the district court invoked this clear legislative purpose: "One of Congress's purposes in enacting § 230(c) was to avoid the chilling effect of imposing liability on providers by both safeguarding the 'diversity of political discourse . . . and myriad other avenues for intellectual activity' on the one hand, and 'remov[ing] disincentives for the development and utilization of blocking and filtering technologies' on the other hand." ER 13:4-11 (citing §§ 230(a), (b), and S. Rep. No. 104-230, at 86 (1996). In light of Congress's broad intent, this Court sitting en banc has emphasized that "close cases . . . *must be resolved in favor of immunity*, lest we cut the heart out of

29

section 230 . . . .” *Roommates.com*, 521 F.3d at 1174 (9th Cir. 2008) (emphasis added).

This Court also has observed that “[t]he Internet is no longer a fragile new means of communication that could easily be smothered in the cradle by overzealous enforcement of laws and regulations applicable to brick-and-mortar businesses.” *Roommates.com*, 521 F.3d at n. 15 (finding that interactive service provider was not immune from liability on the basis of generating and requiring answers to questions that violated the Fair Housing Act or requiring users to submit profiles containing information designed to enable discrimination). That is plainly true.

The issues in this case, however, clearly demonstrate the extent to which the success and ubiquity of the Internet have created new challenges for publishers seeking to police, filter and display vast quantities of user content in a mature and evolving online environment. With millions of users generating more content by the day than an individual could absorb in a lifetime—and with consumers increasingly turning to user-generated platforms to inform and guide their daily decisions—online publishers must figure out how to sort, prioritize, and present this content to users in a way that is meaningful, comprehensible, and reliable. But we are now far beyond human beings reviewing and fact-checking letters to the editor. The dramatic increase in the amount of user content on the Internet requires

30

new and increasingly complex tools for exercising these traditional editorial functions.

Yelp's solutions to the problems of manufactured reviews, unreliable user-generated content, and sheer information overload are its algorithmic review filter and summary star ratings. ER 344:8-13; 345:4-14. The filter helps Yelp showcase content that users are most likely to value and that reflects the authentic input of other members of the online community—while suppressing unreliable reviews (positive and negative) from those seeking to distort or suppress online discussion. The "star rating," in turn, aggregates user-generated feedback so that an individual can digest at a glance the collective opinion of hundreds, even thousands, of other users rating a business on Yelp. Section 230(c)(1) clearly immunizes Yelp for these core publishing activities.

### B. Yelp Is Immune from Claims Arising from Its Publication Decisions Under CDA Section 230(c)(1).

#### 1. The District Court Correctly Concluded That Plaintiffs' Allegations That Yelp Authored Negative Reviews Were Wholly Speculative.

Two different district court judges now have correctly concluded that Plaintiffs alleged no facts showing that Yelp created any of the negative (or positive) reviews that give rise to its claims. ER 8:11-18; ER 386:7-9. Specifically, Plaintiffs fail to allege that Yelp wrote *any* reviews about Plaintiffs,

let alone any reviews which were false, written to coincide with advertising pitches, or written to make Plaintiffs "fear" Yelp. *Id.*

Plaintiffs argue that the district court ignored Plaintiffs' allegations that Yelp created negative reviews when concluding that Yelp was entitled to immunity under CDA § 230. Appellants' Br. at 26-27. That is plainly wrong. Instead, the district court correctly concluded that Plaintiffs' allegations that Yelp created negative reviews were wholly speculative. ER 8:10-9:4.

Specifically, the court found that the general "allegation that 'approximately 200 Yelp employees or individuals acting on behalf of Yelp have written reviews of businesses on Yelp," TAC ¶ 37 [ER 349:21-22], and that 'Yelp has paid users to write reviews,' id. ¶ 38 [ER 349:23-26]" provided no basis from which to infer that Yelp authored or developed the content of any of the reviews about the *named Plaintiffs* that are at issue here. ER 8:12-23. These allegations are completely untethered to Plaintiffs' claims in this case and thus fail to "raise more than a mere possibility that Yelp has authored or manipulated content related to Plaintiffs." ER 8:19-23 (citing *Iqbal*, 556 U.S. at 679 ("[W]here the well-pleaded facts do not permit the court to infer more than the possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'").

Likewise, the allegation that Plaintiff Wheel Techniques was unable to match negative reviews on the site to customer records simply does not support the

extensive logical leap that would be required to infer that *Yelp* somehow created those reviews—and is more plausibly explained by other factors, such as poor record keeping or the use of a different name when these reviewers obtained services. ER 8:23-25; ER 355:22-356:4.

Finally, the vague allegation that one of the Plaintiffs heard a rumor from an unnamed source that Yelp at some point terminated employees as a result of unspecified "scamming" in no way supports an inference that Yelp authored negative reviews about the Plaintiffs or anyone else, for that matter. *See* ER 356:26-357:3; ER 8:25-9:4.

Thus, unlike the cases Appellants rely on in their opening brief, Appellants here have failed to allege *any* facts that plausibly suggest that Yelp created the content of any of the reviews or ratings that give rise to their claims or, thus, that Yelp functioned as an "information content provider" outside the protections of CDA Section 230(c)(1). *See Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1125 (9th Cir. 2003) (CDA 2003 immunity applies unless defendant "created or developed the particular information at issue.").

### 2. Plaintiffs' Claims Impermissibly Seek to Hold Yelp Liable for Exercising Publishing Functions.

Plaintiffs' claims against Yelp rest entirely on allegations that Yelp *published* or *removed* third-party reviews that impacted their ratings, which they

allegedly "believed" was an "implicit threat" intended to cause them to advertise. ER 346:4-8. Although Plaintiffs have alleged that Yelp engaged in "extortion" by "posting" (i.e. publishing) negative, third-party reviews on their business pages, *see* ER 366:18-21, they now concede that the CDA shields Yelp from any liability for publishing negative consumer reviews, despite their alleged "belief" that Yelp's decision to post these reviews was an "implicit threat". *See* Appellants Br. at 28; ER 10:3-5 ("Plaintiffs' allegations of extortion based on Yelp's alleged manipulation of their review pages – by removing certain reviews and publishing others or changing their order of appearance – falls within the conduct immunized by § 230(c)(1)"); ER 383:25-26 ("[T]o the extent that the extortion claim is premised on Yelp's failure to remove negative reviews . . . this activity is clearly immunized by the CDA").

Thus, the question presented on appeal is whether Yelp can be liable for *removing* third-party reviews, where it concedes that it is not liable for publishing them. Under the plain language of CDA Section 230(c)(1) as consistently construed by this Court, it cannot.

As a threshold matter, there is no legal or logical basis for distinguishing Yelp's editorial decisions to publish reviews from its decisions to screen or remove reviews. The power to publish necessarily carries with it the power not to publish, and thus, "[s]ubsection (c)(1) . . . . shields from liability *all publication decisions,*

*whether to edit, to remove, or to post*, with respect to content generated entirely by third parties." *Barnes*, 570 F.3d at 1105 (emphasis supplied).[4] *See also Zeran*, 129 F.3d at 330 ("[L]awsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as *deciding whether to publish, withdraw, postpone or alter content*—are barred.") (emphasis added). Thus, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Roommates.com*, 521 F.3d at 1170-71.

Indeed, the selective *removal* of user-generated content was the exact conduct at issue in *Stratton Oakmont* that prompted passage of the CDA:

> Roommate's situation stands in stark contrast to *Stratton Oakmont*, the case Congress sought to reverse through passage of section 230. There, defendant Prodigy was held liable for a user's unsolicited message *because it attempted to remove some problematic content from its website, but didn't remove enough.* Here, Roommate is not being sued for removing some harmful messages while failing to remove others; instead, it is being sued for the predictable

---

[4]     Indeed, with respect to freedom of the press, the Supreme Court has explained that there is little difference between compelling publication and forbidding it: "Compelling editors or publishers to publish that which 'reason tells them should not be published' is what is at issue in this case.  The Florida statute operates as a command in the same sense as a statute or regulation forbidding appellant to publish specified matter.  Governmental restraint on publishing need not fall into familiar or traditional patterns to be subject to constitutional limitations on governmental powers." *Miami Herald Publ'ing Co. v. Tornillo*, 418 U.S. 241, 256 (1974).

consequences of creating a website designed to solicit and enforce housing preferences that are alleged to be illegal.

*Id.* at 1170 (emphasis supplied).

Like the publisher in *Stratton Oakmont*, Yelp's activities in screening third-party reviews identified by its algorithm as potentially unreliable are central to its publishing function. Unreliable "positive reviews" (such as the bogus 5-star reviews many Plaintiffs here posted about their own businesses) are harmful because they distort and dilute legitimate consumer commentary and the integrity of Yelp's service. Likewise, absent Yelp's filtering systems, businesses could be subjected to malicious reviews planted by competitors or disgruntled former employees – rather than legitimate customers. ER 345:8-10 (quoting Yelp's website, which states "While [removal of reviews] may seem unfair to you, this system is designed to protect both consumers and businesses alike from fake reviews (i.e., a malicious review from a competitor or a planted review from an employee).").

Tens of millions of consumers use Yelp instead of other online review sites precisely because they trust that the reviews and ratings published on its website are authentic. But given the sheer volume of reviews posted to Yelp's site (more than *25 million* to date), Yelp must rely on automated software to determine whether to publish or remove particular reviews. Moreover, to prevent abuse of its

36

service, Yelp specifically has designed the filter to operate in ways that prevent wrongdoers from discovering and circumventing the logic behind its proprietary algorithms. ER 345:4-14. Yelp's investment in developing robust technology for policing third party content posted on its site is exactly the type of activity that Congress sought to protect through passage of CDA Section 230. ER 13:4-8; *see also supra,* pp. 28-31.

### 3. Section 230(c)(1) Protects Online Services Providers From Speculative Inquiries Into Their Motives.

Plaintiffs do not seriously dispute that CDA immunity extends to publication decisions to screen and remove third-party content. Instead, they argue that the mere allegation that Yelp acted with an improper purpose—without more—is somehow sufficient to strip Yelp of the protections afforded under CDA § 230(c)(1). Appellants' Br. at 23.

Plaintiffs' position cannot be reconciled with the plain language and broad purpose of subsection (c)(1) immunity, which—unlike subsection (c)(2)—shields online publishers from litigation challenging their publication decisions, irrespective of their alleged motives in exercising those decisions. 47 U.S.C. § 230(c)(1).

Section 230(c)(1) by its terms protects online services providers from speculative inquiries into their motives. Unlike subsection (c)(2)—which shields

37

service providers from liability only for actions "taken *in good faith* to restrict access to or availability of" third party content—subsection (c)(1) does *not* contain a requirement that the service acted in "good faith.[5]  Instead, the inquiry under subsection (c)(1) hinges on the *role* of the interactive computer service—i.e., whether it is functioning as an "information content provider," or instead, exercising "publication decisions, whether to edit, to remove, or to post, with respect to content generated entirely by third parties."  *Barnes*, 570 F.3d at 1105.

The conspicuous omission of a "good faith" requirement in subsection (c)(1) makes clear that Congress did not intend to import a subjective intent or good faith limitation into that provision: "[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (citation omitted).  The text of subsection (c)(1) in conjunction with subsection (c)(2) therefore

---

[5]  Of course, Yelp has always acted in good faith, and Plaintiffs' speculative allegations do not show otherwise.  ER 345:15-346:3.  Indeed, Yelp is immune under subsections (c)(1) and (c)(2)—but as explained, (c)(1) protection for online publishing is considerably more robust, particularly at the pleadings stage, because it protects online service providers from needing to engage in extensive litigation regarding abstract concepts like motive and bad faith that plaintiffs casually allege, without any factual support.

demonstrates that immunity under (c)(1) applies *regardless* of whether the publisher acts in good faith.[6]

Permitting plaintiffs to defeat immunity merely by engaging in speculation about the "implication[s]" or "inference[s]" underlying online publication decisions would "cut the heart out of section 230." *Roommates.com*, 521 F.3d at 1174-75. As this Court has recognized:

> We must keep in mind that this is an immunity statute we are expounding . . . . [C]lose cases, we believe, must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck bites . . . [I]n cases of enhancement by implication or development by inference . . . section 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles.

*Id*.

Traditional publishing functions will always involve subjective judgments, which are likely to be increasingly nuanced as policing and publishing

---

[6] For this reason, Plaintiffs' emphasis on the district court's discussion of CDA immunity when dismissing the Second Amended Complaint is misplaced. Appellant's Br. at 28; ER 385. Although the court suggested in *dicta* that removal of positive reviews for a bad faith purpose might present a "closer question" for CDA 230 immunity, it did not ultimately reach this question because it found (correctly) that Plaintiffs had failed to allege any facts from which such an improper purpose could be interfered. ER 386:6-10. Critically, in discussing the potential application of CDA Section 230 to the removal of user content, the district court cited *entirely to cases addressing subsection § 230(c)(2)* which— unlike subsection (c)(1)—applies only to actions to filter content that were "taken in good faith." *See Barnes v. Yahoo!, Inc.*, 570 F.3d at 1105. This discussion therefore has no bearing on the question whether these publishing activities are shielded under subsection (c)(1), on which the district court relied when dismissing the Third Amended Complaint. ER 11:11-21.

technologies evolve to address the proliferation of online user content and services. *See* ER 12-13 (citing *Blumenthal v. Drudge*, 992 F. Supp. 44, 49-52 (D.D.C. 1998) ("[I]t should be noted that traditional editorial functions often include subjective judgments informed by political and financial considerations.").  Allowing plaintiffs to second-guess these judgments by challenging the *intent* behind online publication decisions would destroy the protection of CDA immunity by subjecting online publishers to "costly and protracted legal battles" based entirely on speculation as to their motives when engaging in protected editorial functions. *Roommates.com*, 521 F.3d at 1174-75.  "Indeed, from a policy perspective, permitting litigation and scrutiny [of] motive could result in the 'death by ten thousands duck-bites' against which the Ninth Circuit cautioned in interpreting § 230(c)(1)." *Id.* (quoting *Roommates.com*, 521 F.3d at 1174).

Moreover, such an outcome could deter publishers from updating their platforms and technology to address the challenges stemming from the vast proliferation of online consumer content and the increasingly sophisticated threats to the integrity of that content.  As the district court found, "One of Congress's purposes in enacting § 230(c) was to avoid the chilling effect of imposing liability on providers by both safeguarding the "diversity of political discourse . . . and myriad avenues for intellectual activity" on the one hand, and "remov[ing] disincentives for the development and utilization of blocking and filtering

technologies" on the other hand." ER 13:4-11 (quoting §§ 230(a), (b)). New

technologies, such as Yelp's review filter algorithm, are more prone to

misunderstanding and thus particularly vulnerable to challenges from "a clever

lawyer . . . argu[ing] that *something* the website operator did encouraged the

illegality." *Id.* These are precisely the concerns that led this Court to affirm that

"close cases . . . must be resolved in favor of immunity". *Roommates.com, 521*

*F.3d* at 1174.

Thus, the district court soundly rejected Plaintiffs attempts to read a "bad

faith" exception into the plain text of subsection (c)(1):

> [F]inding a bad faith exception to immunity under § 230(c)(1) could
> force Yelp to defend its editorial decisions in the future on a case by
> case basis and reveal how it decides what to publish and what not to
> publish. Such exposure could lead Yelp to resist filtering out
> false/unreliable reviews (as someone could claim an improper motive
> for its decision), or to immediately remove all negative reviews about
> which businesses complaint (as failure to do so could exposure Yelp
> to a business's claim that Yelp was strong-arming the business for
> advertising money). The Ninth Circuit has made it clear that the need
> to defendant against a proliferation of lawsuits, regardless of whether
> the provider ultimately prevails, undermines the purpose of section
> 230.

ER 13.

Contrary to Plaintiffs' extreme predictions, nothing about upholding

immunity in these circumstances would insulate bad actors on the Internet from

liability. Appellants' Br. at 11, 26. If Plaintiffs could come forward with non-

speculative allegations of actual, unlawful threats—or could plead non-speculative

facts showing that Yelp itself created specific content which was fraudulent or

41

defamatory—they plainly would be entitled to pursue such claims.  ER 384:19-21.

But in six separate pleadings, Plaintiffs could not do so, and instead, found their

claims of "extortion" *solely on unsubstantiated inferences drawn entirely from*

*Yelp's publication decisions*.  These inferences not only are factually and logically

deficient, they cannot be the basis for liability under the CDA.

> ### 4.      The District Court Correctly Concluded That Yelp May Not Be Stripped of Immunity Based Solely on Publication of Aggregate Star Ratings.

Like many websites that enable user ratings, at the top of each business's

page, Yelp publishes an aggregate star rating which reports the average of

individual star ratings assigned by third-party users.  A business with two 4-star

reviews and two 3-star reviews appearing on its page would have an aggregate star

rating of 3.5—although the volume of reviews posted to Yelp's site makes it not

unusual for hundreds or even thousands of individual user star ratings to be

averaged and reflected in this manner.  The essential content of each rating

factored into the star rating—i.e., the assertion that a business merits a strong five-

star rating or a good three-star rating—is furnished by third-party users who post

their opinions on Yelp.  As the district court correctly held, the aggregate rating

thus is "based on user-generated data."  ER 10:22-23.

The contention that mere aggregation of this user-generated content should

deprive Yelp of protection under the CDA is entirely without merit.  *See*

Appellants' Br. 8-9, 37; *compare Carafano v. Metrosplash.com Inc.*, 339 F.3d 119, 1124 (9th Cir. 2003) ("[S]o long as a third party willing provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process."). Nothing about Yelp's decision to publish a summary of individual star ratings changes the source, message, or content of third-party-generated ratings. Choosing to aggregate user-generated content is simply a practical necessity to make user-generated content accessible and relevant in the context of a service featuring millions of user reviews. Such activity clearly falls within the rubric of "traditional publishing functions," and it must be entitled to protection at the earliest possible stage of litigation. *See Roommates.com*, 521 F.3d at 1176-77. And penalizing Yelp for exercising protected publication decisions—whether to publish or remove individual user reviews—merely because those decisions are reflected in a summary star rating would permit an end run around Section 230's protections.

### (i) Summary Star Ratings Are User-Generated Content.

That Plaintiffs do not and cannot dispute that their summary star ratings are derived from third-party content supplied by individual reviewers, Appellants' Br. at 15, ends the inquiry: an online publisher may not be liable for publishing third party content unless it "augment[s] the content" giving rise to the cause of action

such that it may be considered a "content developer." *Roommates.com*, 521 F.3d

at 1167-68 (finding website did act as a content developer when it authored

unlawful questions, required users to provide unlawful information, and designed a

search system entirely organized around discriminatory criteria); *see also*

*Carafano*, 339 F.3d at 1123 (citing a "consensus developing across other courts of

appeals that § 230(c) provides broad immunity for publishing content provided

primarily by third parties.").  In other words, "so long as a third party willing

provides the essential published content," the interactive service provider is

entitled to immunity.  *Carafano*, 339 F.3d at 1124.[7]

     Thus, the only published decision regarding whether summary ratings are

entitled to CDA immunity correctly concluded that they are.  In *Gentry v. eBay*, 99

Cal.App.4th 816, 834 (2002), the California Court of Appeal found that eBay's star

rating—which consisted of a color-coded star symbol and a "Power Seller"

---

[7] *See also Asia Econ. Inst. v. Xcentric Ventures LLC*, No. CV 10-01360 SVW PJWx), 2011 WL 2469822 at *3, *6 (C.D. Cal. May 4, 2011)(Xcentric Ventures was immune under CDA Section 230(c)(1) from claims asserting that it unfairly charged businesses that were the subject of consumer complaints on its site to make those "negative reports . . . less prominent in internet searches," because practice of "increasing the prominence" of negative complaints about a particular business on its site (unless the business paid money) "is not tantamount to altering [the] message" of the consumer's complaint;  "[a]bsent a changing of the complaints' substantive content, liability cannot be found.")(emphasis supplied); *A-1 Technology, Inc. v. Megedson*, No. 150033/10, Slip Op. at 3 (N.Y. Sup. Ct. June 22, 2011).  (CDA barred the claims alleging that Xcentric Ventures "request[s] money from companies in exchange or removing or reducing the visibility of allegedly defamatory content.")

endorsement that eBay provided to users who had a certain number of positive

feedback ratings from individual users—did not rise to the level of developing

content because "[t]he star symbol and 'Power Seller' designation is simply a

representation of the amount of such positive information received by other users

of eBay's Web site."  Notably, this Court discussed *Gentry* with approval in

*Carafano v. Metrosplash.com Inc.*, 339 F.3d at 1124 (relying on *Gentry* and

finding fact that defendant's "role is similar to that of the customer rating system at

issue in *Gentry*" supported CDA immunity).[8]

### (ii) Yelp Cannot Be Penalized For Exercising Protected Editorial Functions.

Stripping Yelp of immunity on the ground that its protected publication

decisions impact the overall user star rating would impermissibly penalize the very

---

[8] Even directly editing user-generated content—conduct well beyond Yelp's display and aggregation of user-generated content in this case—does not transform a publisher into an "information content provider" for purposes of CDA § 230.  *See Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003) (newsletter editor immune even when he authored headnote explaining that he had informed authorities of the content of the message, which contained an inaccurate accusation) because "the exclusion of 'publisher' liability necessarily precludes liability for exercising the usual prerogative of publishers to choose among proffered material and to edit the material published while retaining its basic form and message."  *Id.* at 1031.  *See also Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009) ("We have indicated that publication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content. . . .  [A] publisher reviews material submitted for publication, perhaps edits it for style or technical fluency, and then decides whether to publish it."); *Roommates.com*, 521 F.3d at 1170 (discussing *Batzel*) ( "an editor's minor changes to the spelling, grammar and length of third-party content do not strip him of section 230 immunity.")

editorial functions for which Yelp is squarely immune under the CDA. *See supra* pp. 34-37. The complained-of "fluctuations" in summary star ratings are a direct and inevitable consequence of Yelp's exercise of publishing discretion—i.e. its decision to use an automated filter that showcases the most reliable reviews (both negative and positive) and filters potentially unreliable reviews. *See supra*, pp. 34-37. Subjecting Yelp to liability merely because Yelp factors its protected publishing decisions into summary ratings would "swallow[] up every bit of the immunity that the section otherwise provides." *Roommates*.com, 521 F.3d at 1167-68. Such a rule would lead to the absurd result that online publishers can be *indirectly* liable for publication decisions for which they are *directly* immune.

As this Court has observed, "[w]ebsites are complicated enterprises," and the CDA must be construed in a manner that preserves publisher immunity for tools that respond to an evolving internet environment. *Roommates*, 521 F.3d at 1174. Given the vast proliferation of online consumer commentary, popular websites must provide new mechanisms to summarize and organize user-generated content or else succumb to information overload. If Yelp were required to include all ratings submitted about a business in its summary—including those associated with unreliable reviews—unscrupulous businesses could distort the collective message of legitimate consumers by planting sham 5-star reviews about their company or 1-star reviews about competitors, like some of the Plaintiffs attempted

to do here. Yelp's exercise of its publishing discretion to prevent bad actors from drowning the authentic consumer opinions furnished on its service—by excluding unreliable reviews from the overall star ratings—is precisely the type of self regulation Congress sought to protect in passing the CDA. *See Zeran*, 129 F.3d at 331 ("Congress enacted § 230 to remove [] disincentives to self regulation . . . .").

## II. PLAINTIFFS' ALLEGATIONS ARE WHOLLY SPECULATIVE AND FAIL TO SET FORTH A PLAUSIBLE UCL OR EXTORTION CLAIM.

Even if the CDA did not shield Yelp from liability stemming from its online publishing decisions—and it clearly does—the district court's Order still should be affirmed for the reasons set forth in the orders dismissing the Second Amended Complaint and in the Final Order: Plaintiffs have failed to allege that Yelp threatened them with unlawful injury or engaged in the wrongful use of fear, as required to plead extortion (or a derivative UCL claim) under California or federal law. *See Mitchell v. Sharon*, 59 F. 980, 982 (9th Cir. 1894); *People v. Sales*, 116 Cal. App. 4th 741, 751 (2004) (reversing attempted extortion conviction because "extortion requires a threat").

### A. Plaintiffs Fail to Allege a Legally Sufficient Claim for Extortion or Attempted Extortion.

Extortion consists of "obtaining of property from another, with his consent . . . induced by a wrongful use of force or fear." Cal. Penal Code § 518. Attempted

47

extortion likewise requires an attempt to extract money or property "by means of any threat." Cal. Penal Code § 524. Generally, the definitions of extortion under California law and the Hobbs Act are considered "substantially the same." *Petrochem Insulation, Inc. v. N. Cal. & N. Nev. Pipe Trades Counsel*, No. C-90-3628 EFL, 1991 WL 158701, at *3 (N.D. Cal. Apr. 30, 1991); 18 U.S.C. § 1951(b)(2) (Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear . . . .").

Plaintiffs concede that they were never directly or explicitly threatened. ER 386:11-16. Instead, they suggest that an "implied threat" to inflict unlawful injury should be inferred from: (i) various statements allegedly made by Yelp's sales team offering benefits to Plaintiffs if they advertised; and (ii) the publication and removal of third-party reviews, including "around" the time period of these sales calls. Appellants' Br. at 39-41; ER 345:15-346:8; 352:18-24; 354:21-23; 356:22-25; 358:19-22. As the district court correctly held, neither suffices to allege a threat as a matter of law.

### 1. An Offer of a Benefit Does Not Establish a Threat.

First, alleged statements by Yelp's sales team offering Plaintiffs benefits if they advertised cannot establish a threat as a matter of law because they do not contain any threat of "unlawful injury" or "wrongful use of fear". *See Sosa v.*

48

*DIRECTV, Inc.,* 437 F.3d 923, 939 (9th Cir. 2006) (affirming dismissal of Hobbs Act claims based on threats to sue unless plaintiffs paid money to defendants, because "extortion [under the Hobbs Act] requires more than fear . . . [t]he use of fear must be 'wrongful'"); *Rothman v. Vedder Park Mgmt.*, 912 F.2d 315, 318 (9th Cir. 1990) (affirming dismissal of extortion claims under Hobbs Act and California law because threats to raise rent and stop paying utilities did not constitute a "wrongful use . . . of fear").

For example, Plaintiff Chan alleged that a Yelp sales representative "*offer[ed] her lots of benefits*" and later offered to "*help her* if she signed up for advertising services." ER 357:19-358:13.  Likewise, C&D conceded that it "declined *the offer*" of various purported advertising benefits from Yelp.  ER 353:26-354:17; *see also* ER 351:11-18 (asserting that Levitt declined to purchase advertising after he was informed that his business "would have an even greater number of Yelp page views" if he advertised); ER 356:11-15 (asserting that Wheel Techniques was told that "we work with your reviews if you advertise with us").

As the district court correctly held, such vague alleged statements are at most an "offer[] of favorable treatment" that is "not the equivalent of an extortionate threat of harm."  ER 387:17-19; s*ee id*. at 387 ("[A]lleged statements by Yelp sales reps that they could manipulate ads in favor of advertisers are also insufficient to imply a threat of harm to plaintiffs"); *see also United States v.*

49

*Tomblin*, 46 F.3d 1369, 1384 (5th Cir. 1995) (under Hobbs Act, "the fear . . . must be of a loss; fear of losing a potential benefit does not suffice."); *United States v. Capo*, 817 F.2d 947, 951 (2d Cir. 1987) (request for payment in exchange for improved chance of getting hired not an extortionate threat); *Sigmund v. Brown*, 645 F. Supp. 243, 246 (C.D. Cal. 1986) (offer to provide chiropractor with favorable reviews in exchange for client referrals not an extortionate threat).

Because Plaintiffs have failed to allege "factual allegations from which any distinct communication of a threat might be inferred," the district court's dismissal of the Third Amended Complaint should be affirmed. ER 386:11-12.

> **2.** **Plaintiffs' Speculative Inferences Based on the Timing of Yelp's Publication Decisions Do Not Plausibly Show a Threat of Harm.**

Stripped of these innocuous allegations, Plaintiffs' claims rest entirely on speculative inferences based on the alleged timing of the removal and publication of third-party reviews on individual business pages. Appellants' Br. at 22-23; *see also* ER 345:15-346:8; 352:18-24; 354:21-23; 356:22-25; 358:19-22. In other words, Plaintiffs impermissibly infer "threats" from publication decisions which are clearly protected under the CDA. *See supra*, pp.34-37. But even if these activities were not protected under the CDA, Plaintiffs' attempts to construe the timing of the "appearance" and "disappearance" of reviews on their business pages

as threats would fail because these inferences are entirely speculative and "entirely

consistent with Yelp's policy, stated in its FAQs and referenced in the SAC, that it

automatically filters potentially fake positive and negative reviews." ER 386:18-

20.

Indeed, as Judge Patel found, although "[a]t first blush, the close temporal

proximity between plaintiffs' decisions not to purchase advertising and the

removal of positive user reviews might appear to send a message that there are

negative consequences in refusing to buy advertising with Yelp," these

allegations—in and of themselves—are insufficient to establish a policy of

"deliberate manipulation" because they "in actuality only provides select snapshots

of plaintiffs' overall star ratings." ER 386. And, indeed, Plaintiff's own

admissions defeat any suggestion that patterns in their user-generated star ratings

are attributable to extortion and, instead, establish that the "mixture of positive and

negative reviews fluctuated over time irresponsive of the activities complained of."

ER 386. Specifically: (i) Levitt concedes that he received negative reviews, and

that 5-star reviews were removed from his business page, months before he was

contacted by Yelp about advertising (ER 560:19-561:10, 561:19-22); (2) C&D

complains that it received negative and positive reviews months before and after it

was contacted about advertising (ER 563:1-2, 12-19; ER 564:12-565:2); (3) Chan

complains that her star rating "initially increased" but then "declined," even *after*

51

she purchased advertising (ER 567:8-18); and (4) Wheel Techniques concedes that it received negative reviews for a two year period *before* it was contacted by Yelp about advertising (ER 355:22-356:6).

Thus, the critical assumption underlying Plaintiffs' claims—that changes in their star ratings resulted from intentional extortion rather than user actions or the legitimate operation of Yelp's screening technology—is wholly and impermissibly speculative. As the district court correctly held:

> [I]n the absence of a more complete picture of [Plaintiffs'] reviews, the court cannot equate a few drops in the overall star ratings to an implied threat of harm from Yelp. These fluctuations could just as easily be the result of planted ads by plaintiffs, the functioning of Yelp's automated filter, or negative attacks from competitors or former employees.

ER 386-87. There simply is no plausible basis to conclude that "fluctuations" in reviews on the Plaintiffs' business pages resulted from a policy of extortion, as opposed to any number of other, more likely factors.

Indeed, the first paragraph of Plaintiffs' opening brief confirms the speculative premise of their claims: Plaintiffs disturbingly admit that they would need discovery to know "*whether* Yelp!'s conduct in manipulating and contributing to Plaintiffs' reviews caused them harm" and "*why* [Plaintiffs'] reviews (and thousands of others) would suddenly change after they declined to purchase advertising." Appellants' Br. at 51-52. Such concessions confirm the

lack of any factual basis for plaintiffs' manufactured claims of "extortion". *See* ER 386; *Iqbal*, 556 U.S. at 681.

### B.  Plaintiffs Fail to State a Valid Claim Under the UCL.

Finally, for the same reasons that plaintiffs cannot state a claim for extortion or attempted extortion, plaintiffs also fail to state a valid claim under the UCL, which requires a showing that Yelp engaged in an "unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200, *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 837 (2006).

Plaintiffs base their sole UCL claim on their unsupported allegations of "extortion" and "attempted extortion." *See, e.g.*, ER 364:4-9.  Because the TAC is devoid of facts that give rise to a plausible inference that Yelp engaged in conduct that is "unlawful" within the meaning of the UCL, *see supra*, pp. 48-52, Plaintiffs' UCL claim was also properly dismissed.

As the district court found in dismissing the Second Amended Complaint, Plaintiffs also fail to allege that Yelp engaged in any "unfair" conduct within the meaning of the UCL.  ER 388:19-389:14.  Plaintiffs allege no facts showing "unfair conduct" under any of the various definitions courts have applied, including facts plausibly suggesting that Yelp's action "offend[ed] an established public policy [or that they are] immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  *McDonald v. Coldwell Banker*, 543 F.3d

53

498, 506 (9th Cir. 2008). Nor are Plaintiffs' allegations of unfairness "tethered to some legislatively declared policy or proof of some actual or threatened impact on competition" in Yelp's industry, as required to establish "unfairness" under the definition established in *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 185-87 (1999).

For this independent reason, the district court's order should be affirmed.

## CONCLUSION

The district court's well-reasoned decision dismissing Plaintiffs' claims as barred by the CDA and unsupported by allegations in the complaint should be affirmed.

Dated: April 27, 2012

/s/ S. Ashlie Beringer

S. ASHLIE BERINGER
  *Counsel of Record*
MOLLY CUTLER
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, California 94304
(650) 849-5300

*Attorneys for Appellee*

54

# CERTIFICATE OF COMPLIANCE
# WITH RULES 32(a)(7)(C) and 32-1

I certify that pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit Rule 32-1, the attached answering brief is proportionately spaced, has a typeface of 14 points, and contains 13,469 words.

Dated: April 27, 2012

_____/s/ S. Ashlie Beringer_____

S. ASHLIE BERINGER

## STATEMENT OF RELATED CASES PURSUANT TO NINTH CIRCUIT RULE 28-2.6

Defendant is unaware of any pending related cases before this Court as defined in Ninth Circuit Rule 28-2.6.

Dated: May 1, 2012

_____/s/ S. Ashlie Beringer_____

S. ASHLIE BERINGER

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on **April 27, 2012**.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

_____ /s/ *Lorraine Nishiguchi* _____

LORRAINE NISHIGUCHI